810 F.2d 195
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
S & R, INC., d/b/a VOB Auto Sales, Appellant,
v.
NISSAN MOTOR CORPORATION IN U.S.A., Appellee,
and
Robert M. Rosenthal; Frank L. Cowles, Jr. and Connecticut
Avenue Datsun, Inc., Defendants.
 No. 85-2305.
 United States Court of Appeals, Fourth Circuit.
 Argued Nov. 11, 1986.
Decided Jan. 21, 1987.
 
 Before WIDENER, PHILLIPS and ERVIN, Circuit Judges.
 Albert D. Brault (Mona Binder Tavss, David G. Mulquin, Brault, Graham, Scott & Brault on brief) for appellant.
 Reed E. Hundt (Maureen E. Mahoney, Eric A. Stern, Latham, Watkins & Hills on brief) for appellee.
 PER CURIAM:
 
 
 1
 This is a diversity action in which S & R, Inc. (S & R), an automobile dealer, sued its franchisor, Nissan Motor Corporation in USA (Nissan) along with a competitive dealer, for breach of the franchise and related agreements. S & R appeals the grant of summary judgment in favor of defendants and we affirm.
 
 
 2
 * Plaintiff S & R is a Maryland corporation with its principal place of business in Rockville, Maryland. Since 1968 it has been a franchisee of defendant Nissan. Nissan is a California corporation that imports and distributes cars and parts manufactured in Japan.
 
 
 3
 In addition to a franchise contract, S & R and Nissan have entered into a Dealer Sales and Service Agreement (the Agreement). The Agreement purports to provide S & R some protection against the establishment of new Nissan dealerships within S & R's sales locality or primary market area (PMA). S & R's PMA is defined in the franchise contract as the area within a ten-mile driving radius of S & R's dealership. In the Agreement, Nissan agrees not to establish new dealerships within a ten-mile radius of S & R unless a market study reveals "in the opinion of [Nissan]" (1) that S & R has not fulfilled its responsibility to "actively and effectively promote the sale of Datsun* vehicles"; (2) that S & R has not effectively promoted the sale of parts or has not provided efficient and courteous service to Datsun owners; or (3) that "market and economic conditions demonstrate the need for an additional Authorized Datsun Dealer" in the area. The Agreement further provides that Nissan will give S & R notice before it conducts a market study, that Nissan will review the results of any market studies with S & R, and that Nissan will permit S & R to submit objections to any proposed addition of dealerships. S & R may demand that its objections be reviewed by Nissan's Policy Review Board (PRB), and Nissan agrees not to appoint any new dealer until the PRB has made its decision. The introduction to the Agreement states that S & R has relied on Nissan's "expressed intention to deal fairly with [S & R]" in entering the Agreement.
 
 
 4
 In 1981 Nissan conducted a market study of the Washington, D.C., area. That study noted that Nissan had "lost sales leadership" in the Washington, D.C., Maryland area and recommended that an existing dealer (Capital Datsun) be moved to a new location. A second study of the same area was done in 1982. This study recommended that either Capital Datsun be moved from northeast to northwest D.C. or that an "open point" be declared in the northwest and a new dealership established.
 
 
 5
 The 1982 study was completed in June 1982. On January 27, 1983, Nissan gave Robert M. Rosenthal a letter stating that it intended to establish a dealership owned by him, "Connecticut Avenue Datsun," in northwest D.C. at a point within a ten-mile radius of S & R's dealership. S & R filed objections with the PRB, but the PRB approved the appointment on April 28, 1983. On May 2, 1983, Nissan and Connecticut Avenue Datsun entered into a dealership agreement.
 
 
 6
 S & R filed this action in Maryland state court in March 1983, alleging that Nissan had breached several provisions of the Agreement, including the obligation to "deal fairly" with S & R. Nissan had the action removed to federal court and in September 1985, moved for summary judgment. The district court granted Nissan's motion on November 22, 1985, holding that S & R had failed to substantiate on the summary judgment record its assertion that Nissan had acted in bad faith or otherwise breached the Agreement. This appeal followed.
 
 II
 
 7
 Summary judgment is properly granted "if the pleadings,
 
 
 8
 depositions, answers to interrogatories, and admissions on
 
 
 9
 file, together with the affidavits, if any, show that there
 
 
 10
 is no genuine issue as to any material fact and that the
 
 
 11
 moving party is entitled to a judgment as a matter of law."
 
 
 12
 Fed.R.Civ.P. 56. Nissan supported its motion for summary
 
 
 13
 judgment with affidavits and deposition testimony that
 
 
 14
 presented an adequate legal and evidentiary basis for the
 
 
 15
 granting of summary judgment in its favor. The burden then
 
 
 16
 shifted to S & R to come forward with "specific facts
 
 
 17
 showing that there is a genuine issue for trial." Ross v. Communications Satellite Corp., 759 F.2d 355, 364
 
 
 18
 (4th Cir.1985); see also Celotex Corp. v. Catrett, 106 S.Ct. 2548, 2553
 
 
 19
 (1986) (nonmoving party's burden described). We agree with
 
 
 20
 the district court that S & R has failed to meet this burden.
 
 
 21
 S & R contends on the summary judgment record that there are
 
 
 22
 several genuine issues of material fact as to whether Nissan
 
 
 23
 has breached the terms of their Agreement and the provisions
 
 
 24
 of the Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221-1225
 
 
 25
 , by failing to follow the specified procedures for
 
 
 26
 appointing a new dealer in S & R's PMA and by otherwise
 
 
 27
 failing to "deal fairly" with S & R. Specifically, S & R
 
 
 28
 contends that its forecast of evidence raised the following
 
 
 29
 genuine issues of material fact:
 
 
 30
 1. Whether Nissan notified S & R of the creation of an open
 
 
 31
 point only one day before it appointed a new dealer in
 
 
 32
 violation of its agreement not to appoint a new dealer until
 
 
 33
 the PRB had reached a decision;
 
 
 34
 2. Whether Nissan harbored a residual resentment toward S &
 
 
 35
 R because S & R had successfully blocked Nissan's
 
 
 36
 efforts to establish another dealership
 
 
 37
 in its area four years ago;
 
 
 38
 3. Whether Nissan unfairly based its decision to open a new
 
 
 39
 dealership on a market study that failed to state why there
 
 
 40
 was less market penetration by Nissan than its competitors,
 
 
 41
 failed to take into account the availability of units for
 
 
 42
 sale, and thus failed to demonstrate a need for another dealer;
 
 
 43
 4. Whether Nissan's waivers of its standard facility
 
 
 44
 requirement and its contiguous dealership policy
 
 
 45
 for the benefit of the new dealer
 
 
 46
 demonstrate that Nissan did
 
 
 47
 not deal fairly in
 
 
 48
 the appointment;
 
 
 49
 5. Whether Nissan's actions were really motivated by a
 
 
 50
 desire to give Rosenthal another dealership;
 
 
 51
 6. Whether Nissan's PRB was an unfair forum;
 
 
 52
 7. Whether Nissan "bought off" other dealerships that would
 
 
 53
 have objected to the appointment of the new
 
 
 54
 dealership by permanently increasing
 
 
 55
 their automobile allocations.
 
 
 56
 All of these, says S & R, go to the question of "fair
 
 
 57
 dealing," an issue of fact, obviously material,
 
 
 58
 that could not properly be resolved by
 
 
 59
 summary judgment. We disagree.
 
 
 60
 Of S & R's contentions, the strongest is the contention that
 
 
 61
 "unfair dealing" could be inferred from the fact that Nissan
 
 
 62
 appointed a new dealer only one day after its declaration of
 
 
 63
 an open point, thus breaching both the provision of the
 
 
 64
 Agreement that it would not take such action until after a
 
 
 65
 PRB decision and its obligation of fair dealing. We agree
 
 
 66
 with the district court, however, that as a matter of law
 
 
 67
 this particular conduct could not constitute an actionable
 
 
 68
 breach of contract.
 
 
 69
 Under the terms of the Agreement, if a study indicates that one of the conditions that would justify the establishment of a new dealer in S & R's PMA exists, Nissan must "so advise [S & R] by written notice and, upon [S & R's] request [must] review the results of the study with [S & R] ... and provide to [S & R] the opportunity to comment on the results of any such study." S & R properly showed that it did not receive the required written notice of the results of the 1982 study until January 26, 1983. Nissan does not contend that it provided written notice before that date but rather contends that it verbally notified S & R of the results of the study on its completion in June 1982 and that it reviewed the results of the study with S & R and considered S & R's comments. S & R agrees that this was the case. Thus it appears that although a technical breach occurred, S & R was given notice and the right to comment and was not dealt with "unfairly" in the sense of being actually harmed.
 
 
 70
 S & R then points out that a further breach occurred when Nissan notified S & R by letter dated January 26, 1983, that it intended to appoint a new dealer and went on to appoint that new dealer in a letter dated January 27, 1983. S & R contends that this action breached the provision of the Agreement requiring that Nissan, after giving notice, delay the appointment of a new dealer until the PRB had rendered a decision. S & R argues that because the PRB did not approve the new appointment until April 1983, the January 27, 1983, appointment breached the contract and gives rise to an inference of bad faith.
 
 
 71
 In response, Nissan asserts that the January 27, 1983, letter was a letter of intention, not an appointment. Nissan correctly points out that the letter conditions the appointment on, among other things, approval of the appointment by the PRB. Nissan also points out, without rebuttal, that its prompt action was justified by the fact that Rosenthal had taken an option on property in the "open point" which was about to expire.
 
 
 72
 We agree again that accepting the undisputed facts of this particular occurrence, no actionable breach of contract could be found as a matter of law. The January 27, 1983, letter indicated only Nissan's intent to give the new dealership to Rosenthal if the PRB assented to the establishment of the open point in S & R's PMA. This action did not breach the Agreement's requirement that no actual appointment occur until after the PRB had given its assent.
 
 
 73
 Even if it were possible for a jury to find that the January 27, 1983, letter was a letter of appointment and therefore that Nissan had technically violated the Agreement, S & R has not alleged or introduced any facts to support the inference that a new dealership would not have been appointed had Nissan complied with the exact letter of the agreement. Thus S & R has demonstrated no actionable harm from any such technical violation that would justify monetary relief. To the extent the breach might have justified equitable relief, S & R obtained it in the form of a state court injunction prohibiting Nissan from taking final action on the appointment until the PRB had issued its decision. Nissan complied with this injunction.
 
 
 74
 S & R's remaining contentions are weak. The contention that Nissan harbored some residual resentment towards S & R, even if relevant, is unsupported by the record. Other than showing that it "won" and Nissan "lost" in a battle four years ago, S & R has not stated any facts to support its claim. Nissan has contradicted any possible inference of bad faith from the earlier events with uncontradicted affidavits that the incident was not discussed during the process of establishing the new dealership.
 
 
 75
 S & R contends that Nissan's reliance on the 1982 market study, which was contradicted by a 1981 study, failed to state why Nissan's market penetration was lessening, and failed to take into account the availability of units for sale, raises a genuine issue of Nissan's "fair dealing." The argument essentially is that the study was inaccurate. This raises no genuine issue, however, because the Agreement permits the appointment of a new dealer when required by market conditions "in the opinion of the Seller."
 
 
 76
 S & R then suggests that the study's lack of thoroughness itself might support an inference of bad faith. But so far as the record shows, the study was quite thorough in its examination of population, housing values, economic conditions, and sales and in its comparison of Nissan's performance with that of Datsun & Honda.
 
 
 77
 S & R contends that the market penetration problems could have been solved merely by increasing its allocation of vehicles and that a "good faith" study would have reached this conclusion. It fails, however, to cite any evidence that would support this contention. Nissan, by contrast, has submitted an uncontradicted affidavit that S & R had to sell some of its allocated cars to another dealer because it could not sell them to the public.
 
 
 78
 S & R's contention that the granting of waivers to the new dealership, which permitted noncompliance with some of Nissan's policy requirements also fails to support an inference of bad faith. Nissan admits that it accommodated Rosenthal by allowing him to put his dealership in a cramped facility, but points out, without contradiction from S & R, that it granted a similar waiver to S & R.
 
 
 79
 Nissan further asserts that it did not violate its prohibition against the establishment of contiguous dealerships for the benefit of Rosenthal. Even assuming that it did for the purpose of summary judgment, this would not demonstrate any bad faith in dealing with S & R. Nothing in the Agreement obligates Nissan to grant or withhold waivers to other dealers in ways acceptable to S & R.
 
 
 80
 Nissan was obligated by the contract to "deal fairly" with S & R in the PRB review process. S & R alleges that the PRB was unfair. It supports this allegation with the fact that the Board is composed entirely of Nissan's management. This fact alone, however, cannot support the inference that all of the PRB's acts are unfair, especially since the Agreement dictates the composition of the PRB.
 
 
 81
 S & R seeks to raise the issue of ambiguity in the term "dealing fairly" for the first time on appeal. It has failed to show how it and Nissan disagree on its meaning or to propose any possible alternative meaning that might be relevant to the resolution of this controversy. The naked allegation that a term is ambiguous cannot save S & R from summary judgment. Further, Nissan admits that it was obligated to deal fairly with S & R.
 
 
 82
 Although S & R does not argue with any great conviction that Nissan breached its obligation of "good faith" under the Automobile Dealers Day in Court Act (ADDCA) it is worth noting that no genuine issue of material fact exists as to Nissan's alleged breach of that obligation. The ADDCA imposes on automobile manufacturers a duty to comply in good faith with the terms of the franchise. 15 U.S.C. § 1222. "Good faith" is defined as "the duty of each party to any franchise ... to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party." 15 U.S.C. § 1221(e). S & R has not alleged the existence of any contested or uncontested facts that would give rise to the inference that Nissan coerced, intimidated, or threatened S & R.
 
 
 83
 In essence, S & R's problem is that it bargained for and obtained an agreement with its franchisor which gave the latter almost complete latitude in decisions to locate other dealers within S & R's "primary territory." By the very terms of the franchise and related agreements, S & R's rights to remain the sole Datsun-Nissan dealer within its "primary territory" were little more than an expectancy, dependent ultimately upon Nissan's subjective evaluation of S & R's performance and its own economic interest. The boilerplate "fair dealing" obligation provided no objective standards by which it might be enforced. To every suggestion of possible "unfair dealing" advanced by S & R, Nissan replied on the summary judgment record with completely plausible and factually unrefuted explanations which brought its conduct within the contemplation of the agreement. Under the circumstances, a jury or other fact-finder could only have found a breach of the amorphous "fair dealing" obligation by the roughest sort of speculation.
 
 
 84
 Summary judgment was appropriately granted on the record presented.
 
 
 85
 AFFIRM.
 
 
 
 *
 Nissan Motor Company was formerly Datsun Motor Company